CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

NOV 20 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BERNHARD KOTHE, | CIVIL No. 3:05cv00064 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| CONTINENTAL TEVES, INC., | |
| *Defendant* | JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant's Motion for Summary Judgment, filed on

November 1, 2006 (docket entry no. 23). For the following reasons, this motion will be

GRANTED in an order to follow.

## I. BACKGROUND

### A. Factual background

Plaintiff Bernhard Kothe ("Plaintiff") was employed by Defendant Continental Teves,

Inc. ("Defendant") from March 1, 2000, until November 4, 2004, as an engineer responsible for

maintaining and repairing German-made manufacturing machines. Defendant hired Plaintiff in

part because of his prior experience working in Portugal as an engineer on similar machines.

Plaintiff has had several medical procedures related to his diabetes. In September 2001,

Plaintiff's doctor required that Plaintiff not be able to wear steel-toed shoes at work, apparently

as a result of foot ulcers. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. 2; Scott Aff. ¶ 14) In

August 2002, Plaintiff broke both feet. (Compl. ¶ 11)

1

Sometime in late 2002, Defendant opened an investigation ("investigation") into internal processes and controls relating to its purchasing department; specifically, Defendant "was concerned that [Plaintiff] had pressured purchasing department personnel to buy replacement machine parts from a German company ... for which [Plaintiff's] father worked." (Scott Aff. ¶ 5) Indeed, one of Plaintiff's co-workers — a purchasing department employee — later confessed to allegedly taking bribes from Plaintiff and from a representative of the German company to "gain her help as part of a scheme to replace parts that were not actually worn out[] and buy new parts from" the German company. (Scott Aff. ¶ 9) In return, Plaintiff allegedly received kickbacks from the German company. (Scott Aff. ¶ 9) The co-worker was fired. (Scott Aff. ¶ 9) The investigation was suspended for a period of time following the death of Plaintiff's supervisor[1] but was reinstated by Plaintiff's newly appointed supervisor in May 2004.

In January 2003, after the investigation had already begun, Plaintiff's right foot[2] was amputated. (Compl. ¶ 11) In May, 2004, Plaintiff had all five toes of his left foot amputated (Compl. ¶ 11) and was restricted in the amount of time he could stand and walk (Def.'s Mem. in Supp. of Mot. for Summ. J. 2). On October 28, 2004, Plaintiff fractured his left foot (Compl. ¶ 14). On November 1, 2004, Plaintiff allegedly informed Defendant that he would be out of work indefinitely (Compl. ¶ 15), but Plaintiff's deposition reveals that Defendant did not receive this notification until November 9, 2004 (*see* Kothe Dep. 62:9–65:7 (stating that Plaintiff faxed his doctor's November 1 recommendation that Plaintiff be out of work to Defendant on November 9)).On November 2, representatives of Defendant met with Plaintiff to discuss the results of the

---

[1] Plaintiff's supervisor allegedly committed suicide. (Scott Aff. ¶ 7)

[2] Defendant, however, states that Plaintiff's right *leg* was amputated. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. 2) The Court notes that Plaintiff refers to the amputation alternatively as involving his right foot (*see, e.g.,* Compl. ¶ 11; Kothe Dep. 18:7–8, 18:16–19, 19:14–15,) or his right leg (*see, e.g.,* Kothe Dep. 22:9–10; 39:12–14; 41:11–12; 44:24–45:1). The distinction is immaterial for purposes of the Court's analysis that follows.

2

investigation, but Plaintiff allegedly was "uncooperative, evasive, and made inaccurate statements when confronted with the evidence of kickbacks and manipulation of purchasing procedures." (Scott Aff. ¶ 11) Defendant fired Plaintiff on November 3. (Scott Aff. ¶¶ 3, 12)

Plaintiff states that his firing was based on Defendant's "erroneous belief that [Plaintiff] did not work in the best interest of the company." (Compl. ¶ 16) Defendant states, however, that Plaintiff was fired after the investigation revealed that Plaintiff was "guilty of violations of company policies, breaches of fiduciary duty, involvement in apparent kickbacks and fraud, and inducing one or more other employees to cooperate in his schemes." (Scott Aff. ¶ 18)

Plaintiff complained to the EEOC and was later issued a right-to-sue letter.

### B. Procedural background

Plaintiff filed suit in November of 2005, alleging Defendant violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. He seeks an injunction preventing Defendant from further alleged discrimination against Plaintiff, reinstatement, compensatory damages, punitive damages, attorneys' fees, and costs. Defendant moved for summary judgment on November 1, 2006 and Plaintiff filed a timely brief in opposition. This matter is therefore ripe for decision.

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party,

3

determines that the Rule 56(c) standard has been met. S*ee, e.g., Celotex Corp. v. Catrett*, 477

U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Shaw v.*

*Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc,*

763 F.2d 604, 610 (4th Cir. 1985).

If the nonmoving party bears the burden of proof, as is the case here, "the burden on the

moving party may be discharged by 'showing' ... an absence of evidence to support the

nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence

of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating

genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. A court must grant a

motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to

make a showing sufficient to establish the existence of an element essential to that party's case

and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. The

nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

pleading, but ... [must] by affidavits or as otherwise provided in ... [Rule 56] set forth specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Indeed, Plaintiff

cannot defeat a properly supported motion for summary judgment with mere conjecture and

speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation

by the non-movant," here, Plaintiff, "cannot create a genuine issue of material fact.").

## III. DISCUSSION

### A. ADA Framework

The Fourth Circuit applies the *McDonnell Douglas*[3] three-part burden-shifting framework

to ADA claims in which the defendant employer states that any adverse employment action

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

4

against the employee plaintiff was based on legitimate reasons unrelated to the plaintiff employee's disability. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995). Such is the case here. Under that framework, the plaintiff carries the initial burden of proving a prima facie case of discrimination. *See id.* at 58. If the plaintiff is successful, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for taking the adverse action. *See id.* If the defendant meets this burden, the plaintiff must then demonstrate that defendant's stated reason is merely a pretext for discrimination. *See id.*

As to the first part of the *McDonnell Douglas* framework — Plaintiff's prima face case — Plaintiff must show that (1) "he is within the ADA's protected class"; (2) "he was discharged … under circumstances that raise a reasonable inference of unlawful discrimination"; and (3) "at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations." *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001) (citing *Ennis*, 53 F.3d at 58).

The Court finds for the reasons below that Plaintiff has not shown he is disabled under the ADA and that Plaintiff has failed to demonstrate that Defendant's legitimate, non-discriminatory reason for firing him was pretext for discrimination.

### B. Plaintiff is not "disabled" under the ADA

Defendant argues that Plaintiff is not within the ADA's protected class — that is, that Plaintiff is not disabled as that term is defined in the ADA and in cases interpreting that act. With all due respect to Plaintiff, the Court agrees.

A "disability" is a "physical … impairment that substantially limits one or more of the

5

major life activities" of here, Plaintiff. 42 U.S.C. § 12102(2)(A) (2000).[4] To succeed in his suit, then, Plaintiff must have a physical impairment, must identify a "major life activity," and the physical impairment must "substantially limit" the identified major life activity. Whether an ADA plaintiff is disabled is a question of law for the court. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) ("Whether [the plaintiff] meets the definition of the statute, and therefore can bring a claim under the statute, is a question of law for a court, not a question of fact for a jury."); *Lochridge v. City of Winston-Salem*, 388 F. Supp. 2d 618, 626 (M.D.N.C. 2005).

Incidentally, the EEOC has published regulations that define these ADA terms, *see* Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. § 1630.2 (2006); although the regulations are not binding, they are owed great deference. *See, e.g., Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479 (1999) (stating that "[n]o agency ... has been given authority to issue regulations implementing the generally applicable provisions of the ADA").[5]

Here, Plaintiff has, without question, a physical impairment. *See* 29 C.F.R. § 1630.2(h)(1). And plaintiff has stated that his diabetes-related injuries have affected the major life activities of walking and standing.[6] (*See* Compl. ¶ 21) There is a question, however, of

---

[4] Plaintiff does not contend in his suit that he is disabled under the definitions provided in 42 U.S.C. § 12102(2)(B) or (C).

[5] The Fourth Circuit has used regulatory definitions to resolve ADA cases. *See, e.g., Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996).

[6] The Court notes that Plaintiff indirectly states that his work has been also affected by his injuries. (*See* Kothe Dep. 20:23-25 (stating that he is "not capable to climb on [the] machines, work on machine[s] as a mechanic[] as I did in 1993 when I installed those machines")) "Work," however, may not be a major life activity under the ADA. *See, e.g., Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."); *Muench v. Alliant Foodservice, Inc.*, 205 F. Supp. 2d 498, 503 n.1 (D. Md. 2002). To the extent that work could be a considered a major life activity, however, a plaintiff

whether Plaintiff's injuries "substantially limit" his abilities to stand and walk.

"Substantially limits" means:

> Unable to perform a major life activity that the average person in the general population can perform; or
>
> Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)–(ii). Factors a court should take into consideration when deciding whether an major life activity has been substantially limited include: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." § 1630.2(j)(2); *see also Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996).

The Supreme Court recently held that the definition of "substantially limits" must be "interpreted strictly to create a demanding standard for [plaintiffs to] qualify[] as disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). In fact, the Court further defined "substantially limited" to mean that a plaintiff "must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Id.* at 198.

Here, the evidence shows that Plaintiff — during his employment with Defendant, the

---

must show that he could not work in a "broad range of jobs." *Toyota Motor*, 534 U.S. at 200; *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 471 (4th Cir. 2002). Plaintiff has made no such explicit claim here and there is no evidence before the Court that would allow it to reasonably infer such a claim. In fact, Plaintiff has continued to work in (apparently) the same capacity in which he was working for Defendant. (*See* Kothe Dep. 9:25–12:22, 14:7–16:5 (stating that Plaintiff has been employed doing similar work from January 2005 until October 2006))

7

relevant time period for his ADA claim — was prohibited by his doctor from wearing steel-toed

shoes (*see* Kothe Dep. 48:2–49:12; Def.'s Ex. A, #1) and was restricted for a four-week time

span to sitting for fifteen to thirty minutes for every hour he was standing or walking (*see* Kothe

Dep. 57:21–61:25; Def.'s Ex. A, #7 (stating that Plaintiff "may only stand for 1° at a time then

must sit for a minimum of 15-30'" and that this restriction "should remain in effect [for] 4

weeks" from the date of the document, which is May 28, 2004); *see also* Kothe Dep. 20:12–16

(stating that apart from this report, Plaintiff had no newer limitations)). There is nothing else in

the record to substantiate Plaintiff's claim that he was "substantially limited" in his ability to

stand and walk.[7]

Additionally the Court notes that it must analyze Plaintiff's condition based on the

"limitations [he] *actually* faces." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488 (1999).[8] In

other words, the Court can — and should — recognize that Plaintiff uses a prosthetic device.

(*See* Kothe Dep. 18:20–23)

As for the restriction on not wearing steel-toed shoes, two federal courts have ruled that

---

[7] The Court recognizes that Plaintiff stated in his deposition that he has other complications: that he "cannot walk like you, eight hours, or, like before, twelve hours a day. I have to sit down between times. I cannot stand all day long. Let's say, a minimum of one-third of an hour, I have to sit — like 20 minutes of an hour, I have to rest," that he "cannot stand constantly" (Kothe Dep. 19:1–8), that "even now like last night or whenever I travel on the airport I have a hard time to walk longer distances" (Kothe Dep. 43:17–19), that he experiences "phantom pains," that he has "problems" "walking up, walking down" (Kothe Dep. 44:11–14), that it "is not easy to balance or to walk. It is not easy to walk uphill or downhill" (Kothe Dep. 44:21–22), and that he must be careful while walking with his prosthesis because "you never know when you step on something" (Kothe Dep. 44:25–45:1). But there is nothing before the Court to indicate that these conditions — other than the no-steel-toed-shoes restriction and the restriction requiring him to periodically rest, discussed above — were present at the time Plaintiff was working for Defendant. Indeed, Plaintiff appears to have incurred further injury to his left foot since the time he was terminated by Defendant. (*See* Kothe Dep. 43:16 (stating that "the wound has collapsed"))

[8] The Supreme Court ruled in *Sutton* that ADA plaintiffs are *not* "to be evaluated in their hypothetical uncorrected state," but that instead, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures — both positive and negative — must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the" ADA. *Sutton*, 527 U.S. at 482; *see also id.* at 475, 488-89 (holding that the plaintiffs — twin sisters each with uncorrected visual acuity of 20/200 or worse, but with 20/20 vision or better when wearing corrective lenses — were not disabled because "disability under the Act is to be determined with reference to corrective measures").

such a restriction does not "substantially limit" the major life activities of standing or walking. *See Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1026 (5th Cir. 1999); *Cavallaro v. Corning Inc.*, 93 F. Supp. 2d 334, 344 (W.D.N.Y. 2000).

And as for the time restriction, Plaintiff's doctor recommended that it be in place for only four weeks. As the Court stated in *Toyota Motor*, however, for an impairment to "substantially limit" a major life activity, ["t]he impairment's impact must … be permanent or long term." *Toyota Motor*, 534 U.S. at 198. There is simply no evidence before the Court to suggest that Plaintiff's doctor imposed restrictions on his walking and standing past the four-week period.

Even assuming, however, that the steel-toed shoes requirement and the time restriction were sufficient, Defendant would still prevail. Plaintiff must put forth more evidence than he has here. *See id.* ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those claiming the Act's protection … to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience … is substantial." (internal quotation marks omitted)). And, to take it one step further, even if *this* were sufficient, "Plaintiff has offered no evidence that he is substantially limited in these major life activities *as compared with an average person in the general population*" as is required. *See Thomas v. Potter*, 325 F. Supp. 2d 596, 605–06 n.8 (M.D.N.C. 2004) (construing "disabled" under the Rehabilitation Act[9]) (emphasis added); *see also* 29 C.F.R. § 1630.2(j)(1)(i)–(ii).

Because Plaintiff is not disabled for purposes of the ADA, the Court will not address the remaining elements of his prima facie case.

---

[9] "The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

9

## C. Plaintiff has not demonstrated pretext for discrimination

Even assuming Plaintiff could meet the first part of the *McDonnell Douglas* three-part burden-shifting framework (proving a prima facie case of discrimination), Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, a reason Plaintiff fails to demonstrate is merely a pretext for discrimination. Defendant here stated that Plaintiff's supervisor suspected Plaintiff was engaged in "inappropriate and potentially criminal activities" and therefore reinstated an earlier, suspended investigation to determine whether Plaintiff had engaged in wrongdoing. The results of the investigation showed, according to Defendant, that Plaintiff engaged in self-dealing and vendor favoritism and, therefore, had breached his duty of loyalty to Defendant. In support of this assertion, Defendant has submitted a binder of materials it says reflects this conclusion. (*See* Def.'s Ex. D, #1, #2)

Plaintiff now carries the burden of establishing that Defendant's explanation is merely a pretext for discrimination. *See Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

Pretext "means a lie, specifically a phony reason for some action," *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002), or it "means a dishonest explanation, a lie rather than an oddity or an error," *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005).

Plaintiff can show pretext by demonstrating that Defendant's explanation is "unworthy of credence" or by "offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir.

10

2002); *Wright v. N.C. Dep't of Health & Human Servs.*, 405 F. Supp. 2d 631, 636 (E.D.N.C. 2005).[10]

To show pretext, a plaintiff need not produce any additional evidence of discrimination distinct from the evidence supporting his prima facie case, so long as that evidence is sufficient. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000) (holding invalid the requirement that "a plaintiff must always introduce additional, independent evidence of discrimination" to survive summary judgment). But, in order to survive summary judgment, Plaintiff must do more than present conclusory allegations of discrimination; "concrete particulars are required." *Meiri v. Dacon*, 759 F.2d 989, 998 (2nd Cir. 1985) (applying the pretext analysis to a Title VII case and affirming the trial court's granting of summary judgment). And, notably, mere conjecture is insufficient to overcome a summary judgment motion. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Plaintiff argues here that Defendant was motivated by discrimination and points to his deposition statements to support that argument. Additionally, Plaintiff argues that Defendant's audit of Plaintiff's activities and behavior in the months and years leading up to Plaintiff's termination was a pretext for discrimination for several reasons: the length of time required by investigators before they compiled sufficient evidence against Plaintiff, that the Defendant "singled out" Plaintiff for "heightened scrutin[]y," that the timing of the audit's commencement

---

[10] The Court believes that the parties' reliance on *Jackson v. Alabama. State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005), for the proposition that an ADA plaintiff can show pretext by showing that the defendant's explanation is unworthy of credence or "by persuading the court that a discriminatory reason more likely motivated the employer" in its decision to terminate the plaintiff is an incorrect statement of law in the Fourth Circuit. As noted above, the proper test is showing the defendant's explanation is unworthy of credence or offering "other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002).

11

coincided with Plaintiff's injuries, and that the timing of the audit's ending (resulting in Plaintiff's dismissal) coincided with other of Plaintiff's injuries.

With these considerations in mind, the Court will look to see whether Plaintiff demonstrated Defendant's explanation was "unworthy of credence" or if Plaintiff offered "other forms of circumstantial evidence sufficiently probative of intentional discrimination."

*1. Unworthy of credence*

Nowhere does Plaintiff argue that Defendant's explanation for terminating him is not worthy of believability; that is, Plaintiff never argues against the veracity of the investigation that led to his termination. Instead, Plaintiff merely states in his deposition that Defendant was motivated by discrimination when it fired him. (*See* Kothe Dep. 78:24–81:14)

Plaintiff gives no support for this claim:[11]

> Q: Why do you believe you were terminated by Continental?
>
> A: Jeff Hoots treated me since my amputation like a very strange person. In a couple of meetings, I told him that he was doing things in the company which are illegal. And he told me in very harsh — very sharp words in one-to-one meetings that if I wouldn't stop that, that he would take care of me. He took care of me.
>
> Q: What were the things that you were complaining about or warning them about?
>
> A: Jeff Hoots told my supervisor … that we have to copy software … which is absolutely illegal. We did that.… I told that also in writing the CEOs from Continental Teves that this is a breach of copyright, which is totally illegal. Mr. Jeff Hoots then told me in my face that those are his machines and he can do what he wants.
>
> Q: So you think that Hoots was retaliating against you because of this software issue?
>
> A: I don't think, I know. He already — he did that to another guy which also quit the shop. He left. Mr. Jeff Hoots believed that this company is his company and he could do what he wants. He told me in

---

[11] Indeed, the excerpt that follows is taken from a portion of Plaintiff's deposition in which he claims that he was actually fired for pointing out activities by other employees that were possibly illegal — namely, that the company could be violating copyright laws or software licensing agreements.

12

my face once: We should have taken care of you when it was a better time.

Q: So you think that his allusion to an earlier time had to do with the fact that he wanted to get rid of you because he thought you were going to blow the whistle on this software issue?

A: No. I believe that he had something against me for my capabilities with my amputation for — I believe that he was simply — he had something about me with my foot or with my capabilities, I don't know, honestly.

(Kothe Dep. 78:24–80:15)

Plaintiff makes these charges of discrimination, however, without any supporting facts whatsoever, even when he is pressed on the issue:

Q: Did [the supervisor] ever say anything about that? Did he call you names or make comments like that?

A: No.

Q: So the only time he said, "We should have gotten rid of you when we could have," was in the context of complaining about the Siemens software?

A: Yes. That was not the only thing. We talked about other things too.

Q: What other things were they?

A: Right now, I don't recall right now. There was more things.

(Kothe Dep. 80:16–81:1)

The Court reads these excerpts to suggest that Plaintiff is stating that he may have been fired for retaliation, not that Plaintiff is arguing that Defendant's investigation was a pretext for discrimination. In fact, there is good evidence that Defendant's explanation is quite worthy of credence: there was a lengthy investigation into wrongdoing by defendants and others,[12] the investigation led to the firing of another employee for allegedly accepting bribes from Plaintiff (Scott Aff. ¶ 9), Defendant likely would not have waited four years to fire Plaintiff, Plaintiff was

---

[12] A point Plaintiff unsuccessfully tries to use to argue pretext. *See infra.*

given leaves of absence when requested, and Plaintiff was given accommodations for his maladies.

In short, Plaintiff has failed to point to anything to suggest that Defendant's articulation of a legitimate, non-discriminatory reason for Plaintiff's termination was unworthy of credence.

### 2. Other circumstantial evidence sufficiently probative of intentional discrimination

Plaintiff argues that Defendant's audit was a pretext for discrimination because the investigation coincided with Plaintiff's injuries, it took awhile to uncover evidence against Plaintiff, and it singled out Plaintiff. These arguments, however, are not persuasive.

Mere assertions of questionable timing, "in and of themselves are simply insufficient to counter unrebutted evidence of legitimate, nondiscriminatory reasons for" being fired. *See, e.g., Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002). Courts considering the pretext requirement in other contexts have also found coincidences of timing to be insufficient to establish pretext. *See, e.g., Nelson v. J.C. Penny Co.*, 75 F.3d 343, 346–47 (8th Cir. 1996) (analyzing pretext element of burden-shifting framework in retaliatory discharge claim and vacating judgment for plaintiff), *reh'g denied*, 79 F.3d 84 (8th Cir. 1996); *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86-87 (8th Cir. 1990) ("Caudill makes much of the fact that his termination was close in time to the addition of a new age discrimination claim against Farmland. Based on that slender reed of evidence, however, it would be nothing but rank speculation to suggest [a causal connection between the termination and the claim.]"); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991) (stating in a Title VII retaliation case that "an inference based upon timing alone" is insufficient to suggest discriminatory motives).

14

Plaintiff argues, too, that the length of time required by the investigators to compile

sufficient evidence against Plaintiff shows pretext. (*See* Pl.'s Mem. in Opp. to Def.'s Mot. for

Summ. J. 7-8 (stating that the audit "span[n]ed almost two years before compiling sufficient

evidence") The Court is not persuaded. Merely because an internal investigation required two

years to uncover evidence sufficient enough for Defendant to feel it was justifiable in firing

Plaintiff does not mean that that justification is somehow misplaced or, here, "pretext." Indeed,

the record makes clear that the audit was interrupted by the death of one of Plaintiff's

supervisors and was not reopened until another supervisor became suspicious of Plaintiff's

activities. (*See, e.g.*, Scott Aff. ¶¶ 5, 7-12)

Plaintiff also argues that the Defendant "singled out" Plaintiff for "heightened scrutin[]y"

and that therefore, Defendant's articulated reason for terminating Plaintiff must be pretext.

Again, the Court is not persuaded. In fact, Plaintiff seems to have singled out Defendant for

heightened scrutiny because, in the words of the very source used by Defendant to argue this

point, other employees of Defendant alleged that Plaintiff "had pressured purchasing personnel"

to purchase parts from a vendor who employed Plaintiff's father. (*See* Def.'s Ex. D, #1; Scott

Aff. ¶ 5) As Defendant stated, "strong pressure to purchase from one vendor often represents a

fraud risk factor." (*See* Def.'s Ex. D, #1) It appears Defendant singled Plaintiff out because it

suspected he was engaged in wrongdoing; there is no evidence to suggest otherwise.

\* \* \*

In sum, Plaintiff has failed to show that Defendant's explanation for terminating

Plaintiff's employment is merely a pretext for discrimination. Plaintiff has not attacked

Defendant's explanation as being unworthy of credence and has not offered other forms of circumstantial evidence that are sufficiently probative of intentional discrimination.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion will be GRANTED in an order to follow.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _____
United States District Judge

_____
Date    November 20, 2006

16